**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SANDRA A. SIKORSKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 15 C 2178** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandra A. Sikorski seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits under Title II of the Social Security Act (the "SSA"). 42 U.S.C. § 405(g). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff moved for summary judgment seeking reversal or a remand, and Defendant responded with arguments in support of affirming the decision. After careful review of the record, the Court denies Plaintiff's motion and affirms the Commissioner's decision to deny benefits.

## PROCEDURAL HISTORY

Plaintiff applied for disability benefits on August 19, 2011, alleging that she became disabled on April 1, 2010 due to Crohn's disease, bulging discs in her neck, arthritis in her hands and knees, attention deficit disorder, and depression. (R. 131, 134). The Social Security Administration denied the application initially on November 22, 2011, and again upon reconsideration on May 11, 2012. (R. 15, 62, 63). Plaintiff

filed a written request for hearing and appeared before Administrative Law Judge Sylke Merchan (the "ALJ") on September 19, 2013.  (R. 29-61).  The ALJ heard testimony from Plaintiff, who was represented by counsel (the same counsel representing her in this appeal), along with medical expert Alan Heineman, Ph.D. (the "ME"), and vocational expert Craig Johnston (the "VE").  (*Id.*).  The following month, on October 24, 2013, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act from April 1, 2010 through the date last insured, March 31, 2012, because she was capable of performing past relevant work as a shipping checker.  (R. 15, 24). The Appeals Council denied Plaintiff's request for review on January 9, 2015, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.  (R. 1-3).

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) erred in determining that Plaintiff's mental impairments are not severe; (2) improperly ignored medical evidence in the records of her treating physicians suggesting Plaintiff suffers from disabling physical impairments, and instead engaged in her own lay person analysis; (3) made a flawed residual functional capacity ("RFC") assessment by not considering all impairments in combination, and improperly discounting Plaintiff's statements regarding the severity and limiting effects of her symptoms; and (4) ignored the VE's testimony that a person needing to use the bathroom 6-9 times throughout the day would be unemployable.  As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and does not require reversal or remand.

<u>**FACTUAL BACKGROUND**</u>

Plaintiff was born on August 17, 1964 making her 47 years old on the date last insured and 49 years old at the time of the ALJ's decision. (R. 24, 117). She is a high school graduate and lives with her husband and two of her three children aged 19 and 25. (R. 35). In the fifteen years prior to filing for disability, Plaintiff reported working: part-time for a collection agency (November 1997 to May 1998); full-time in customer service for an import/export warehouse (January 2004 to June 2005); and full-time for a repair and towing company (June 2005 to April 2009). (R. 142-145).[1]

**A.      Medical and Other History**

**1.      2005**

On March 12, 2005, Plaintiff was admitted to Evanston Northwestern Healthcare complaining of abdominal pain and exhibiting acute cholecystitis.[2] (R. 217). Plaintiff told doctors she had been diagnosed with Crohn's disease 16 years earlier and been admitted to the hospital for flare-ups 4 times over the preceding 4 years. (R. 222). Based on results from CT scans, Plaintiff was diagnosed with Crohn's disease and treated with antibiotics therapy. (R. 236, 250). She was discharged on March 17, 2005

---

[1]      There is conflicting evidence regarding Plaintiff's employment history. The above information is from a "Work History Report" form signed by Plaintiff on September 8, 2011. (R. 142-145). During the hearing before the ALJ, however, Plaintiff testified that she worked at the repair and towing company (owned by her husband) for only two years and on a part-time basis, ending in 2009. (R. 36-37). She said she worked for the import/export company for one and a half years prior to working for her husband's company. (R. 39). But according to a Detailed Earnings Query listing FICA earnings, Plaintiff's earnings from her husband's company were in 2008 ($3,615) and 2009 ($2,300). Before this, her earnings from Channel Distribution Corp. (the import/export company) were in 2005 ($19,797.40), 2006 ($18,948.57), and 2007 ($8,757.60). (R. 124-125). She also reported earnings from a collection company in 1997 ($1,343) and 1998 ($14,887.53), and from another collection company in 2002 ($17,794).

[2]      Acute cholecystitis "is sudden swelling and irritation of the gallbladder [that] causes severe belly pain." Medline Plus, U.S. National Library of Medicine, Medical Encyclopedia, Acute Cholecystitis, https://medlineplus.gov/ency/article/000264.htm (last visited July 23, 2016).

with instructions to follow-up with a gastroenterologist, and prescriptions for Asacol (an anti-inflammatory) and two antibiotics. (R. 244).

Based on a referral from the office of Nader Aziz, M.D., Plaintiff's primary care physician, Plaintiff underwent a lower GI series for her Crohn's disease on April 4, 2005. The tests showed a complete obstruction of the distal ascending colon that was not typical for Crohn's disease. (R. 284). A May 11, 2005 CT scan of the abdomen and pelvis further showed a "[m]arkedly abnormal right colon and cecum with marked thickening of the wall and significant limitation and irregularity of lumen with extension of mass outside the colon." (R. 283). Plaintiff testified that she underwent a colon resection sometime later in 2005, but there are no medical records of that procedure. (R. 41). Plaintiff testified that after the surgery, her condition from Crohn's disease, including frequent bowel movements, "just steadily seemed to have gotten a little bit worse" and "they haven't really been able to put it into remission since then." (R. 42).

The record does not contain information regarding treatment in the second half of 2005. As noted, Plaintiff worked full-time for an import/export company that year. (R. 125).

**2. 2006**

The record contains no information regarding any medical treatment in 2006, and Plaintiff worked full-time for the import/export business that year. (*Id.*).

**3. 2007**

The record contains no information regarding medical treatment during the first eleven months of 2007. On December 12, 2007, Dr. Aziz referred Plaintiff for a gallbladder/right upper quadrant sonography due to her history of Crohn's disease and

4

liver functions. (R. 277). The test was normal. (*Id.*). Plaintiff worked for the import/export company in 2007, but it appears that she worked less than a full year based on her reduced earnings that year. See infra at 3, n. 1. She testified that she quit this job (R. 39), and later suggested she did so due to her Crohn's symptoms. (R. 42) ("I used the bathroom a lot and, unfortunately, I was getting to the point where I was taking too many days and it just, it wasn't worth it. I tried to stay as long as I could….").

### 4. 2008 (Gallbladder removal; hernia; knee problem)

On February 7, 2008, Plaintiff went to Advocate Good Shepherd Hospital with abdominal pains. (R. 273). On examination she was found to have right upper quadrant pain and a distended gallbladder. She was admitted to the hospital for further evaluation and was started on pain control. (R. 274). Plaintiff was discharged on February 9, 2008 with directions to follow up with Barry Rosen, M.D. (R. 271-72). On March 13, 2008, Dr. Rosen performed a laparoscopic cholecystectomy and laparoscopic reduction of an internal hernia at Good Shepherd Hospital. (R. 260). Plaintiff's gallbladder was removed and the internal hernia was reduced. (R. 261). There were no reported complications. (R. 260). The only other medical treatment records in 2008 reflect that on April 15, 2008, Plaintiff had x-rays of her right knee due to complaints of pain. The tests showed minimal osteoarthritic changes with no fracture or lesions. (R. 279).

In terms of her employment, Plaintiff worked for her husband's auto repair and towing company. While her Work History Report said she worked full-time, she testified during the hearing that in 2008 she worked 20 to 30 hours a week depending upon how she felt, and her husband paid her when he had money. (R. 37).

**5.     2009**

The record contains no information regarding any medical treatment in 2009. According to her Work History Report, Plaintiff stopped working for her husband's company in April 2009.  (R. 142).  FICA earnings from that company in 2009 were $2,300.  (R. 125).  Plaintiff testified that she stopped working because "it got to the point where I was probably off more than I was there."  (R. 37).  She said that since her husband could not count on her to be there, "he had to put somebody else in the position."  (*Id.*).[3]

**6.     2010**

In support of her disability claim, Plaintiff provided records of several visits to Dr. Aziz's office between February 26, 2010 and February 5, 2013.  Based on these records, it appears that Plaintiff never actually saw Dr. Aziz but instead received treatment from a physician assistant ("PA") – usually Sheila Gillick ("PA Gillick") and occasionally Stacy Baum ("PA Baum").  (See R. 210).  At each visit, the PA recorded Plaintiff's "Chief Complaint," "Reason for Visit," and other information.  The electronic medical record for these visits contain sections to record notes on various topics, such as: a comprehensive list of history of present illnesses; current medications; diagnosis history; review of systems; social history; and family history.

**February to May of 2010 (Back and Neck Pain):** The first treatment report from Dr. Aziz's office, dated February 26, 2010, reflects the "Chief Complaint" and "Reason for Visit" as "neck pain for a few weeks."  (R. 331).  Plaintiff complained to PA Baum of intermittent neck and right upper arm/shoulder pain that had been coming and going for

---

[3]     According to a Function Report completed in September 2011, Plaintiff continued to go to the company a few times a week "to visit my husband at work."  (R. 154).

two weeks. (*Id.*). The pain became worse at night, and with sitting, looking down, and turning her head from side to side. (*Id.*). The pain in her upper arm/shoulder area was minimal and there was no arm weakness, difficulty with fine manipulative tasks, tingling or numbness. (*Id.*).

On examination, PA Baum observed that Plaintiff had no lump or swelling in her neck, and her "shoulders showed a normal appearance" with normal motion on the right. (R. 332-33). There was no pain elicited on motion or during an impingement test. (*Id.*). Plaintiff's sternocleidomastoid and scalene muscles were tender on palpitation, but her cervical spine appeared normal, there was no tenderness, and the intrinsic muscles of the neck and shoulder muscles showed no weakness. (*Id*). PA Baum diagnosed a neck strain, advised Plaintiff to rest her neck and avoid excessive strain, and prescribed Flexeril (a muscle relaxant) and Norco (a pain reliever) for use as needed along with heat and massage. (R. 333-34).

Plaintiff made no mention of any problems with frequent bowel movements or diarrhea during this visit. Under social history and work, the records state: "No job change" and "occupation auto business, works with family (does alot (sic) of computer work)." (R. 332).[4]

Plaintiff returned to Dr. Aziz's office the next week, on March 4, 2010, complaining of continued neck and right arm pain. She said the Flexeril provided no relief and she was now experiencing tingling intermittently on her pinky finger and the tip of her thumb. (R. 335). PA Gillick found that Plaintiff's shoulders appeared normal with normal motion on the right and no associated pain. (R. 337). Plaintiff complained of

---

[4]     This same information regarding Plaintiff's employment appears in subsequent records through and including January 31, 2012. (R. 332, 336, 340, 344, 348, 354-355, 361, 364-365, 368, 376, 387).

significant pain with flexion and extension from the shoulder, and muscle tenderness in the sternocleidomastoid and scalene muscles on palpitation, but there was no tenderness in other muscles or areas of the spine. (*Id.*). Plaintiff also exhibited no weakness in the muscles of the neck or the right shoulder. (R. 338). PA Gillick diagnosed a "[c]ervical strain [versus] cervical herniation of C4, C5," and prescribed a Medrol Dose Pack (an anti-inflammatory) and Norco as needed. (*Id.*). PA Gillick noted that if there was no improvement from the medication, an MRI of the cervical spine would be considered. (*Id.*). Again, Plaintiff did not mention any problems with frequent bowel movements or diarrhea

On March 10, 2010 Plaintiff underwent an MRI of her cervical spine that showed a disc bulge with right paracentral/foraminal disc protrusion resulting in mild central spinal canal stenosis and mild to moderate proximal right foraminal stenosis at C5-C6. (R. 325). There was also a shallow broad-based central disc protrusion with an annular tear at C6-C7, and a shallow central disc protrusion at C4-C5 that resulted in mild narrowing of the central spinal canal without significant stenosis. (*Id.*). The test further revealed a slight reversal of the cervical lordosis. (*Id.*).

Plaintiff returned to Dr. Aziz's office on March 11, 2010 to follow up on her MRI results with PA Gillick. (R. 339). The physical exam findings were exactly the same as those observed on March 4, 2010. (R. 340-41). PA Gillick diagnosed Plaintiff with herniated discs at C4-C5, C5-C6 and C6-C7, and radiculopathy in her right upper extremity. (R. 341). PA Gillick instructed Plaintiff to continue taking Flexeril, add Celebrex (an anti-inflammatory) to her medication regimen, and go for a physical therapy evaluation and treatment. (*Id.*).

The only record of Plaintiff's physical therapy is a "Discharge Note" dated May 17, 2010 from Accelerated Rehabilitation Centers (the "Center"). (R. 285). Plaintiff had attended 5 appointments to address "brachial neuritis or radiculitis nos [not otherwise specified]," and missed 1 appointment. (*Id.*). Her treatment consisted of: manual therapy; range of motion exercises; passive manual stretching; progressive resistive strengthening; mechanical traction; body mechanics/postural training; patient education; and instructions on an in home exercise program and therapeutic exercise. (*Id.*). At her appointment on March 25, 2010, Plaintiff reported feeling "quite a bit better," though she was still having some occasional thumb paresthesia and some pain in her cervicothoracic junction. (*Id.*). Plaintiff said she was going on vacation for a couple of weeks and did not return phone calls to schedule further treatment. The Center assumed that Plaintiff was no longer interested in pursuing therapy and discharged her from the Center's active files. (*Id.*). At that time, Plaintiff was reportedly "making progress in terms of her subjective complaints and function." (*Id.*).

As noted previously, Plaintiff alleges she became "disabled" as of April 1, 2010. (R. 131).

On May 24, 2010 Plaintiff again saw PA Gillick. (R. 343). Her "Chief Complaint" was "sinus pressure, sore throat [for] 1 week" and "reason for visit" was "sore on right eye, teeth pain." (*Id.*). The treatment notes reflect that PA Gillick diagnosed Plaintiff with obesity for the first time on record. Her body mass index ("BMI") was recorded as 41.8. (R. 345). PA Gillick prescribed medications for Plaintiff's cold and instructed her to restart Weight Watchers. (R. 345-46). Under Review of Systems, there is an entry

for "Gastrointestinal" which notes "No abdominal pain." There is no mention of problems with diarrhea or too frequent bowel movements.

**October 2010 (Crohn's Disease/Bleeding):** Plaintiff next saw PA Gillick on October 5, 2010, and the PA noted as the "Chief Complaint" that Plaintiff was "being seen for a follow up to her Crohn's Disease" and she reported vaginal bleeding following intercourse related to a prior hysterectomy and to Crohn's disease. (R. 347).[5] PA Gillick diagnosed Crohn's disease of the stomach, obesity (BMI was 35.4), vaginal bleeding, and rectal pain secondary to Crohn's. (R. 349). The records reflect no complaints of diarrhea or frequent bowel movements. PA Gillick ordered blood tests and a urinalysis, and instructed Plaintiff to return to the clinic if the condition worsened or new symptoms arose. She also wrote that Plaintiff "needs to see GI – for colonoscopy." (*Id.*).

Plaintiff returned to PA Gillick on October 19, 2010 for a comprehensive exam, to review her test results, and for a medication refill. (R. 354). PA Gillick noted that Plaintiff did not feel poorly, and had no neck pain or stiffness, and no anxiety, depression or sleep disturbances. (R. 355). Upon physical examination, Plaintiff's neck demonstrated no decrease in suppleness or cervical mass, and her back was normal with no tenderness. (R. 356-57). She still exhibited abdominal tenderness in the left side on palpitation, but her bowel sounds were normal, and there was no evidence of any mass or rigidity in the abdomen. (R. 357). Under "Review of Systems" for "Gastrointestinal," PA Gillick noted: "No dysphagia, no heartburn, no nausea, no

---

[5]    The PA's notes state: "is having vaginal bleeding after having hysterectomy, which started after having sexual intercourse vaginally, which resulted in pressure rectally and the vaginal bleeding, spotting today, yesterday very heavy. Had the bleeding previously which was related to the crohns, since she had a hysterectomy previously." (R. 347).

vomiting, no abdominal pain, and no diarrhea." (R. 355). PA Gillick diagnosed (in relevant part) Crohn's disease, and instructed Plaintiff to follow-up in two weeks for blood work, get a colonoscopy, and increase exercise and weights. (R. 357-58). PA Gillick also provided a prescription for Apriso that was to last through approximately February 2011 (30 day supply with 5 refills). (R. 357). As noted below, it was not until June 9, 2011 that PA Gillick next prescribed Apriso when Plaintiff appeared that day for a "Medication Check" after experiencing an "exacerbation" of her Crohn's symptoms. (R. 370).

       **7.**    **2011**

**March 2011 (arm injury and neck pain):** Plaintiff next went to Dr. Aziz's office on March 3, 2011 after injuring her arm during a fall. Her "Chief Complaint" was "Pain on right side of neck starting to shoot down [patient] fell 10 days ago." Plaintiff reported the neck pain began suddenly and was constant, and included pain, tingling and numbness in her arms, but she had no difficulty with fine manipulative tasks. (*Id.*). Plaintiff rated her pain as an 8 out of 10, and demonstrated tenderness in her shoulder and back muscles. (R. 362). Her cervical spine was abnormal in appearance but she had no elbow weakness and full strength of 5/5. (*Id.*). PA Gillick diagnosed herniated cervical discs C5-C6 and C6-C7 right, cervicalgia, and radiculopathy in the upper right extremity at C5, C6, and C7, and prescribed a Medrol Dose Pack, Flexeril, and Norco. (*Id.*). PA Gillick instructed Plaintiff to follow up in 1 week, indicating that if there was no improvement, an MRI would be considered. (R. 362-63).

      At her next appointment with PA Gillick on March 10, 2011, Plaintiff reported that her neck pain had gotten worse. (R. 364). PA Gillick modified Plaintiff's prescriptions to

Flexeril, Norco and Celebrex, and instructed her to return after seeing an orthopaedic surgeon. (R. 366). Plaintiff saw orthopaedic surgeon Mark T. Nolden, M.D. on March 23, 2011 complaining of throbbing right-sided neck pain with radiation into the parascapular region, right arm, forearm, and associated index finger numbness. (R. 287). Plaintiff reported her fall to Dr. Nolden, and told him that she had a one year history of neck pain and that she underwent physical therapy for one month which helped. (R. 288). Plaintiff stated her pain tended to be worse in the morning and "waxe[d] and wane[d] between a 2 and an 8 on a ten-point scale." (*Id.*). She also reported subjective weakness of the right upper extremity but denied gait or balance problems. (*Id.*).

On examination, Dr. Nolden noted no deformity of the neck, no tenderness when palpating the spine, no trigger point tenderness on either side, and no muscle spasms. (*Id.*). Plaintiff exhibited pain on forward flexion of the cervical spine and was "somewhat apprehensive[]" in performing extension, lateral bending, and rotation, though all those movements were within normal limits. (R. 289). A Spurling's maneuver executed to the right was positive for pain in the right parascapular region, radiating down the right arm, but there was no pain on the left side. (*Id.*). Plaintiff exhibited 4/5 strength in her right triceps and 5/5 in the left, as well as 5/5 motor strength bilaterally in her deltoids, biceps, wrist extensors, wrist flexors, finger flexors and interossei. (*Id.*). Her somatosensation was grossly intact to light touch over the C4 through C8 dermatomes bilaterally, though she did exhibit a diminished right-sided brachioradialis reflex compared to the left. (*Id.*). Plaintiff's biceps and triceps reflexes were symmetric and no pathologic reflexes were elicited in the upper extremities. (*Id.*).

Dr. Nolden took two images of Plaintiff's cervical spine that revealed anterior longitudinal ligament ossification at C5-C6 and C6-C7, but the images were otherwise normal. (R. 289). Dr. Nolden reviewed Plaintiff's MRI from March 10, 2010, and diagnosed "[p]robable right-sided C6 radiculopathy." (*Id.*). He recommended physical therapy and an epidural steroid injection, and scheduled a follow-up appointment in a month. (*Id.*). There is no record, however, that Plaintiff ever had another evaluation with Dr. Nolden.

**June 9, 2011 (Crohn's exacerbation; diarrhea/frequent bowel movements):** Plaintiff was next seen by PA Gillick at Dr. Aziz's office on June 9, 2011. The "Chief Complaint" was "Medication Check." (R. 367). The "Reason for Visit" stated "stomach is bad---crohn's exacerbation, no blood in stool, constant pain and diarrhea – water or mucus – is almost never solid, has 4-5 xa day before noon – 6-9 x/a day – normally 3x/day but always liquid. Visit for: medication refill. Patient is here for interval re-evaluation of therapy for attention deficit disorder ['ADD'] and for long-term medication use evaluation." (R. 367).

On examination, Plaintiff's mood was euthymic, and she reported no problems with her peer group or any socially inappropriate behavior. (*Id.*). Her physical examination was also normal. (R. 369-70). As with each of the other records from Dr. Aziz's office, this one states under "Function": "No physical disability and activities of daily living were normal." (R. 368). PA Gillick's "Assessment" was: "Allergic rhinitis," "ADD," and "Crohn's disease of the stomach Exaccerbation." (R. 370). This is the first medical record diagnosing Plaintiff with ADD and it is unclear what, if any, tests or examinations PA Gillick relied upon in making this assessment.

PA Gillick ordered three lab tests (a comprehensive metabolic panel, "CBC (includes diff/plt)" and "Sed Rate by Modified Westergren"). (*Id.*). She also prescribed Vyvanse for 30 days (no refills),[6] and a longer-term supply of Apriso.[7] (R. 370). Plaintiff was instructed to return in one month for a follow-up visit, but waited seven months (until January 2012) to do so. In the interim, Plaintiff applied for disability benefits on August 19, 2011. (R. 131).[8] In a Function Report completed at that time, Plaintiff wrote that she has to go to the bathroom 6 times per day (once at night), "making it hard to do at work." (R. 150-51).

**Disability Evaluations In Fall of 2011**

> **1.    Dr. Shah:** On October 15, 2011, Mahesh Shah, M.D. examined Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 290). Dr. Shah noted that Plaintiff reported suffering from Crohn's disease for the last 23 years, and that it has been getting progressively worse. In addition, Plaintiff stated that she experiences cramping and diarrhea 8 to 10 times a day, but has never had related fissures or fistulas. (*Id.*). She also complained of worsening pain in her hands and knees for about five years, and neck pain stemming back one-and-a-half years. Plaintiff

---

[6]    Vyvanse (generic name lisdexamfetamine) is a central nervous system stimulant used to treat ADD in adults. *See* https://www.drugs.com/vyvanse.html (last visited September 14, 2016).

[7]    The records reflect two identical prescriptions of Apriso except one was for 30 days with 5 refills (180 days) while the other was for 90 days with 3 refills (360 days).

[8]    During the hearing before the ALJ, Plaintiff's counsel emphasized that Plaintiff applied for disability benefits shortly after seeking treatment on June 9, 2011 for an "exacerbation" of her Crohn's disease, and suggested this as an alternative onset date. (R. 59) ("Now the Claimant's testified that it's been bad, bad for years and she, it's certainly been a problem for years as she had the colon resection all the way back to 2005. But in June of '11, the treating source is using the term Crohn, Crohn's exacerbation, [citation omitted]. To me that would suggest that, that that was a[] point at which things may have even gotten worse from there. That was around the time that the Claimant applied for these benefits. She applied in August of 2011. What I'm suggesting there is a possibility if the Claimant is not found disabled back to the original onset date of April of '10, that perhaps June of '11 where there was a Crohn's exacerbation, could be a possibility as an alternative onset date.").

told Dr. Shah that she had received a cortisone shot earlier in the year, which helped her neck pain for a short period, but the pain had returned and was radiating to her right arm at times with numbness in her right hand. (*Id.*). As a result, Plaintiff said she could not carry any weight in her right hand. (*Id.*).

On examination, Plaintiff exhibited mild tenderness and slightly reduced lateral flexion in the neck, but no deformities or paraspinal muscle spasms. She also had mild tenderness in the right lower quadrant of her abdomen; mild tenderness over her hands and knees with no swelling or deformity; and full range of motion in her hands, knees, and all the joints in the upper and lower extremities. (R. 291-92). Plaintiff was able to get up from a chair, get on and off the examining table, go from a sitting to supine position, and get up from the supine position, all without any difficulties. (R. 291). Her gait was normal, and she was able to bear her own weight, ambulate without assistance, heel-walk, toe-walk, squat partially, and tandem walk. (R. 292). She also had normal ability to grip, grasp, and perform fine and gross manipulations, as well as full motor strength of 5/5 in both upper and lower extremities. (R. 292-93). Dr. Shah diagnosed Crohn's disease; arthritis in the hands and knees; pain in the neck with radiation to the right hand and some numbness of the right index finger; obesity; and mild anxiety and depression. (R. 293). Regarding this last finding, Dr. Shah noted Plaintiff was scheduled to see a psychologist for a mental status examination for the DDS the following week. (*Id.*).

**2. Dr. Sterzik:** On October 22, 2011, Plaintiff was seen by Timothy Sterzik, Psy. D. who performed a psychological evaluation for the DDS. (R. 294). Plaintiff reported taking Apriso and Vyvanse, and said she cannot work a full-time job

because of her physical as opposed to mental problems. These included: (1) abdominal pain that reaches an 8 out of 10 a couple of times a week and the need to go to the bathroom 8 or 10 times a day due to Crohn's disease; (2) pain in her hands of varying degrees and arthritis pain that reaches a 7 out of 10 twice a week; (3) significant neck pain that had reached a 9 out of 10 on a daily basis prior to receiving an epidural shot; and, (4) range of motion problems in her neck. (R. 294-95). Despite these problems, however, Plaintiff said she is able to drive, do housework, cook, and independently perform her activities of daily living. She also tries to get out of the house each day, visits her husband at work, attends her daughter's sporting activities, and goes shopping. (R. 295).

During the mental status examination, Dr. Sterzik observed that Plaintiff made good eye contact; was cooperative, alert and oriented; and demonstrated a logical and coherent thought process. (*Id.*). She did not exhibit any psychoses, derailment of thought, or other deficits, and her overall cognitive abilities appeared intact. (R. 297). Plaintiff's affect was euthymic, and she denied problems with motivation or crying spells. She also reported that her mood was generally fine, though she sometimes became distressed when she experienced abdominal problems. Aside from occasional difficulties getting out of bed in the morning, Plaintiff denied suffering any other symptoms of depression such as a depressed or irritable mood. (*Id.*). She also stated that she was on an antidepressant years prior, but it did not seem to have any effect.

Plaintiff denied experiencing anxiety and said her interpersonal relationships were good with no problems. (R. 295). She told Dr. Sterzik that she does, however, have problems with distractibility, focus, and task completion, and that "she is being

treated with a trial of medication for possible attention deficit hyperactivity disorder." (R. 297). Plaintiff mentioned difficulties with hypersomnia, but Dr. Sterzik found this was "not consistent" with the record. (*Id.*). He diagnosed "R/O [Rule-Out] Attention Deficit Hyperactivity Disorder, inattentive type." (*Id.*).

3.     **Dr. Low:** On November 7, 2011, psychiatric consultant Thomas Low, Ph.D. submitted a Psychiatric Review Technique of Plaintiff for the DDS that included a Rating of Functional Limitations. (R. 299-312). Dr. Low determined that Plaintiff's "R/O ADHD" is not a severe impairment, and it causes only mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. (R. 299-300, 309).

4.     **Dr. Bilinsky:** Approximately two weeks later, on November 18, 2011, medical consultant Richard Bilinsky, M.D. submitted a Physical RFC assessment of Plaintiff for the DDS. (R. 313-20). As part of his review, he examined the longitudinal record, including the consultative physical examination and findings. Dr. Bilinsky found Plaintiff can occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit with normal breaks for about 6 hours in an 8-hour workday, and push and/or pull without limitation. (R. 314). He imposed no other postural, manipulative, visual, communicative, or environmental limitations. (R. 315-17).

After these expert evaluations, Plaintiff's disability claim was denied on November 22, 2011. On January 12, 2012, Plaintiff requested reconsideration. (R. 64-67, 69)

**8. 2012 Visits to Primary Care Physician**

**January 2012:** Plaintiff saw PA Gillick on January 24, 2012, approximately seven months since her preceding visit. (R. 375). Her "Chief Complaint" was a medication check. (*Id.*). Under "Reasons for Visit" Plaintiff reported:

- her knees were bad, though she had not been taking anything for the arthritis, and her hands were painful from arthritis;

- her neck was better, but she still experienced numbness in her right index finger;

- her upper right arm hurt with elevation;

- she "always has problems" with her stomach and "still goes to the bathroom 6-9X/day" but had not yet gone for a colonoscopy as instructed;

- "Crys [sic] all the time, wants to sleep all the time, no changes in sexual desire, increased irritability, increased guilt, decreased energy, decreased concentration"; no personality changes, homicidal or suicidal thoughts, and only occasional anhedonia; gained 30 pounds over the preceding 6-8 months so had restarted Weight Watchers;

Plaintiff's physical examination was normal with no abdominal tenderness or muscle rigidity, her mood was euthymic and her affect was normal. (R. 378). PA Gillick diagnosed (in relevant part) Crohn's disease, depression, and ADD, and prescribed Vyvanse and Cymbalta (an anti-depressant). (R. 378-79). PA Gillick scheduled a comprehensive physical examination for the following week and instructed Plaintiff to exercise, and discussed a proper diet on Weight Watchers. (*Id.*). She also noted that Plaintiff was "working through family counseling," and would get a colonoscopy and related lab tests. (R. 376, 379). Plaintiff requested and received a clinical summary at this visit and each subsequent visit through December 4, 2012. (R. 379, 391, 398, 411, 416).

Plaintiff returned to Dr. Aziz's office for her examination on January 31, 2012. The "Chief Complaint" was physical examination, and Plaintiff's "Reason for Visit" included exam, review of test results, and medication refill.  (R. 386).  PA Gillick noted that Plaintiff did not feel poorly, had no neck pain and no lump or swelling in her neck. (R. 387-88).  Under "Review of Systems" for "Gastrointestinal," PA Gillick noted: "Gastrointestinal symptoms Crohn's.  No dysphagia, no heartburn, no nausea, no vomiting, and no abdominal pain.  Diarrhea."  (R. 388).  PA Gillick described Plaintiff's anxiety and depression as "well controlled."  (*Id.*).  Plaintiff had no motor disturbances but exhibited a sensory disturbance in her right index finger.  (*Id.*).  Her neck, back and abdomen were all normal, as were her sensations, gait, stance and reflexes.  (R. 389-90).  PA Gillick diagnosed Crohn's disease, depression, anxiety disorder, arthritis, paresthesia right index finger-secondary to 3 bulging cervical discs, and chronic cervical neck pain.  (R. 390).  She instructed Plaintiff to continue her current medication regimen, and discussed a proper diet and exercise.  She also noted that Plaintiff "will schedule colonoscopy with Dr. Atia- [diagnosis]: Crohn's."  (R. 391).  The record for this visit, as well as for each preceding and subsequent visit, states under the "Functional" heading: "No physical disability and activities of daily living were normal."   (R. 332, 336, 340, 344, 348, 355, 361, 365, 368, 376, 387, 408, 414, 419, 424).

 Plaintiffs date last insured (March 31, 2012) was two months after this appointment. (R. 17).

**July 2012:** Approximately 5 months after her prior visit, Plaintiff returned to PA Gillick on July 5, 2012.  The "Chief Complaint" was "medicine check."  (R. 394).[9]  Under

---

[9]      As noted previously, the prescription of Apriso provided during the June 9, 2011 visit would have lasted only through June 9, 2012.

"Reason for Visit" the record stated (in relevant part) that Plaintiff "is having problems with her Crohns again-diarrhea at least 6 times a day "as well as pain in her knees. (*Id.*). Her relevant medications at the time included Meloxicam (an anti-inflammatory) and Wellbutrin (an anti-depressant). (*Id.*). Plaintiff's physical exam produced normal results in most areas, including no abdominal tenderness. (R. 396-97). Though Plaintiff's knees showed an abnormality of significant crepitus bilaterally, there was no swelling or tenderness to palpitation, and her gait was not impaired. (R. 397). PA Gillick diagnosed arthritis, Crohn's disease, and knee pain, and counseled Plaintiff about exercising and a proper diet. (*Id.*). She also instructed Plaintiff to continue her current medications, including Meloxicam for the knee pain, and prescribed Apriso, 30 days with 5 refills, and a Medrol dose pack. (R. 398).

**August 2012:** Plaintiff did not return to Dr. Aziz's office for approximately seven months, until August 9, 2012. The "Chief Complaint" and "Reason for Visit" was to discuss changing her Apriso prescription due to the cost. (R. 407). Plaintiff's physical exam showed all areas checked were normal. (R. 409-10). Under "Review of Systems," PA Gillick noted "Gastrointestinal: Abdominal pain intermittently." (R. 409). There was no indication of diarrhea or an abnormal number of bowel movements. PA Gillick instructed Plaintiff to continue her current medication regimen, but prescribed Pentasa, 30 days with 1 refill, in the place of Apriso to try and reduce the cost, along with Feldene (a nonsteroidal anti-inflammatory drug to treat pain). (R. 410-11). PA Gillick also discussed Plaintiff's diet, exercise, and lifestyle modifications. (R. 411).

**December 2012:** Four months later, Plaintiff saw PA Gillick again, on December 4, 2012, with the "Chief Complaint" being "Medcheck, [patient] would like to start back

on Feldene." (R. 412). Under "Reason for Visit" Plaintiff reported she had not yet scheduled her now-long-overdue colonoscopy, and that she could not afford the medications she needed or see her gastroenterologist, Dr. Atia, because "she owe[d] him lots of money." (*Id.*). The "Reasons" further note that Plaintiff was "very irritable with her husband, fighting with him in the office," and complained of feeling tired with a decreased ability to concentrate. (*Id.*). She told PA Gillick that the Wellbutrin was not working, but she did not like taking Zoloft and could not afford any of the new medications. (*Id.*). In addition to emotional liability, the record reflects that Plaintiff suffered from feelings of "hopelessness/[w]orthlessness," anhedonia, apathy and low self-esteem. (*Id.*). She denied any social withdrawal, loss of interest in friends and family, or suicidal thoughts. (*Id.*). The notes make no mention of abdominal pain, diarrhea or abnormal bowel movements.

On examination, PA Gillick observed that Plaintiff's grooming was normal, but she demonstrated psychomotor retardation and agitation. (R. 415). Her mood was dysthymic, frustrated, unhappy, depressed, irritable and angry, and her affect was blunted and abnormal. (*Id.*). There was no impairment in her thought processes. (*Id.*). PA Gillick diagnosed moderate recurrent major depression and anxiety disorder NOS; prescribed sulfasalazine (an anti-inflammatory to treat her Crohn's disease), Feldene for pain, and Wellbutrin and Lexapro for depression. (R. 415-16). In response to PA Gillick's suggestion that she go for a consultation with a mental health counselor, Plaintiff said she "has not had luck in the past." (R. 415). PA Gillick further recorded that "she wants to change gastroenterologists-she was given the names of 2 local GI's

Dr. Mar[y] Kane, Dr. Mitchell Bernsen both at [Northwest Gastroenterologists Endoscopy Center]." (*Id.*).

Plaintiff saw PA Gillick two weeks later on December 20, 2012. Her "Chief Complaint" was "2 week [follow-up] to new medication Feldene" and "reason for visit" was "still has cold for 2 weeks, non-productive cough, worst at night, no fever, no chills" and "had flu shot 2 weeks ago." (R. 417). Plaintiff's grooming was normal and her behavior showed no psychomotor retardation or agitation. (R. 420). Her mood was euthymic, her affect normal and her thought processes and content revealed no impairment. (*Id.*). PA Gillick diagnosed moderate recurrent major depression and anxiety disorder NOS, and prescribed medications for Plaintiff's cold and instructed her to continue taking Lexapro and Wellbutrin. (R. 421).

### 9.    2013

**Final Visit to Primary Care Physician:** Plaintiff's final visit of record at Dr. Aziz's office was with PA Gillick on February 5, 2013. Her "Chief Complaint" was "sick [for] 1 week, cold cough, no fever" and her "reason for visit" further explained "not bringing anything up –[]still coughing frequently—not productive—feels congested, [post-nasal drip], sore throat, no chills, no fevers, ears okay" and "medication refill." (R. 422). There was no record of complaints of abdominal pain, diarrhea or frequent bowel movements. In addition to viral syndrome, PA Gillick diagnosed Plaintiff with depression, prescribed cold medications, and instructed her to continue her current medications. (R. 425-26).

**Dr. Kane/Colonoscopy:** The last available treatment record is from Mary Kane, M.D., who performed Plaintiff's colonoscopy on February 27, 2013. (R. 427). Under

"History of Present Illness" the record states: "The patient reports a long history of Crohn's disease of the ileum. She does not recall being treated with steroids or Imuran, but has been treated with Apriso and Lialda. … Patient … seen [by] Dr. Atiyah. She is not sure when her last small bowel follow-through was done. …Patient is in the process of applying for disability because of her Crohn's disease because of diarrhea and abdominal pain." (*Id.*). Dr. Kane diagnosed Crohn's Disease Unspecified Enteritis and Crohn's Disease Small Intestine. Her "Impression" was "clinically quiescent Crohn's disease on sulfasalazine." She recommended that Plaintiff continue taking sulfasalazine, have a colonoscopy every two years, and schedule an office visit to review previous records. (*Id.*). There are no records of subsequent visits to Dr. Kane.

B.    **Plaintiff's Testimony**

At the September 19, 2013 hearing before the ALJ, Plaintiff testified that she last worked in 2009 at Area Wide Recovery, her husband's towing and auto repair business, where she answered phones, dispatched drivers and tried to help with the books. (R. 36-37). She worked between 20 and 30 hours per week depending on how she felt, but had to quit because she was absent too often and her husband knew he could not count on her. (*Id.*). Her FICA earnings from that business were minimal: $3,615 in 2008 and $2,300 in 2009. Plaintiff testified that "when [her husband] had some money, he gave me some money. It wasn't like a regular steady income or anything." (R. 37). Prior to working for her husband, Plaintiff was in customer service for an import/export warehouse in Itasca. (R. 38). That job, which Plaintiff appears to have held in 2005, 2006, and part of 2007 (based on FICA earnings), mostly entailed sitting and she only

rarely had to lift more than 10 pounds.  (R. 38-39, 124-25).  Plaintiff testified that she quit this position.  (R. 39).

Plaintiff stated her Crohn's disease interferes with her ability to work because it causes stomach pain and necessitates frequent trips to the bathroom.  (R. 39).  On average she needs to use the bathroom 6-9 times a day, for approximately 5-10 minutes each time.  (R. 40).  In response to questions from her attorney regarding whether she takes medication to control the 6-9 trips to the bathroom, she testified that she had been taking Lialda (a nonsteroidal anti-inflammatory drug that treats ulcerative colitis) for about 4 months.  (*Id.*).  She added that she had been working with her doctor "trying different medications because we haven't been able to put it into remission." (*Id.*).  Plaintiff said they had tried at least six different medications.  (R. 40-41).  When asked who the primary treating source was for her Crohn's disease, she identified "Dr. Atia" (a gastroenterologist) and said she had been seeing him for about four years and lately she had been seeing him every couple of months "because we're trying to find something that works."  (R. 41).  When asked what medications Dr. Atia had tried in order to treat her over the prior four years, Plaintiff responded: "The Sulfasalazine which is really kind of a beginner thing, so that wasn't helping.  Pentasa, Apriso, and now I have an appointment to see him next month and he wants to try something different because he doesn't feel the Lialda is effective."  (*Id.*).[10]

Counsel for Plaintiff then asked how long she had been experiencing "the frequency of urgency of having to go to the bathroom" that frequently.  (*Id.*).  Plaintiff responded that "[b]efore the surgery [in 2005] it got worse."  (R. 42).  She noted that

---

[10]     There is no documentation from Dr. Atia's office in the record.

while she had suffered from Crohn's disease for about 25 years, the symptoms have "steadily seemed to have gotten a little bit worse." (*Id*.). When the ALJ asked how she had been able to work at the import/export place, Plaintiff said she used the bathroom a lot. She added that she stayed "as long as I could" but it "got too hard." (*Id*.). Plaintiff described the pain from the Crohn's disease as anywhere from an internal churning gas, to a dull pain, to a more severe almost stabbing pain that ranges from a 4 to a 10 on a 10-point scale. There is constantly some form of pain, but the "deeper" pain comes and goes throughout the day. (R. 43). Plaintiff also experiences fatigue associated with the Crohn's disease, and said she often has to lie down in the afternoon and relax because she feels so tired. (R. 45).

In addition to the abdominal problems, Plaintiff said that work is difficult because she experiences stiffness in her joints, neck and back when she sits for too long. (R. 43-44). Writing too much also triggers arthritis pain that goes up the nerve in her right arm. (R. 40). The pain starts in her neck and travels down her right shoulder through her arm to her index finger. (R. 43). Plaintiff received an epidural shot a few years before the hearing, which calmed the pain down "quite significantly," and though she still has a constant dull pain, it is at a tolerable level - most days around a 3 or 4. (R. 43-44). Plaintiff also complained of constant pain in her knees from arthritis at a level of 6 to 7 every day, with cracking that sometimes feels like "bone touching bone." (R. 44). If she sits in the same position for too long, the knees stiffen and it is very painful for her to stand up. (*Id*.). Plaintiff takes Tylenol for the pain, along with an occasional prescription Norco. (*Id*.).

With respect to her mental condition, Plaintiff testified that she takes Wellbutrin and Lexapro for depression or anxiety, both of which were prescribed by her primary care doctor as opposed to a psychiatrist. (R. 46). She reported seeing a psychologist for about a year with her family in an effort to get them to pitch in with household chores. The therapy was "pretty effective," but the family stopped going about a year before the hearing. (R. 46-47).

Plaintiff testified that she has a valid driver's license and her own car. (R. 36). She can walk for about a block and stand in one place for approximately 15 minutes before experiencing pain in her knees and back. (R. 45). She can sit for half an hour and then she needs to adjust her position or stand up due to pain in her knees or in her rear end. (R. 46). Plaintiff explained that the rear end pain is caused by hemorrhoids associated with the Crohn's disease and going to the bathroom all the time. (*Id.*). Plaintiff does most of the grocery shopping, usually with her mom, husband or daughter, and finds it easier to walk by leaning on the grocery cart. (R. 48). Whoever is with her helps Plaintiff bring the groceries into the house. (*Id.*).

Plaintiff is able to get some chores done but has to sit down after 20 minutes, and her husband does most of the cooking. (*Id.*). At the same time, Plaintiff visits with friends and tries to go out to dinner or have them over to the house once a week. (R. 48-49). She also goes to family parties and family events, though she sometimes has to cancel plans because the stomach pain is too bad or she is too tired. (R. 49). Plaintiff testified that she has good days and bad days, about 50/50. On a good day, she can get up, shower and go out and watch her daughter at the bowling alley. If it is a bad day, she is "hanging on the couch and just kind of chilling." (R. 50).

**C. Medical Expert's Testimony**

Dr. Heinemann, a clinical psychologist, testified at the September 19, 2013 hearing as the ME after reviewing the entirety of the record and considering the testimony during the hearing.[11] (R. 51-52). He opined that Plaintiff suffers from major depressive disorder and attention deficit disorder, but neither of these impairments either individually or collectively equals a listing under 12.02 or 12.04. (R. 52-53). In discussing Plaintiff's functional restrictions, the ME referenced the B Criteria of the listings and found only mild limitations in all areas. Specifically, Plaintiff has mild limitation in activities of daily living as evidenced by the fact that she is able to grocery shop with assistance from a family member. She also has mild limitation in social functioning given her ability to go out and visit friends and have company over to the house. Finally, Plaintiff's ADD imposes only mild limitations in her attention and concentration. (R. 53). Accordingly, the ME characterized Plaintiff's depression and ADD as non-severe impairments. (*Id.*).

**D. Administrative Law Judge's Decision**

The ALJ found that from April 1, 2010, the date her alleged disability began, through March 31, 2012, the date last insured, Plaintiff suffered from Crohn's disease, degenerative joint disease of the cervical spine, and obesity, but that these severe impairments, individually or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17-19). After reviewing the available treatment notes and the ME's opinion, the ALJ gave significant weight to Dr. Low's consultative opinion and found that Plaintiff's mental and

_____

[11]    In response to questioning from the ALJ, Plaintiff's counsel confirmed that Plaintiff had no additional written evidence to present outside of what the record contained prior to the hearing. (R. 33).

emotional health did not approach the level of a medically determinable impairment causing any significant limitations on her ability to perform basic work activities for any continuous period of 12 months. (R. 18). The ALJ further found that while Plaintiff has hypertension, it constitutes a non-severe impairment. (*Id.*).

The ALJ conducted a detailed review of Plaintiff's Disability Reports, Function Reports, the medical record, testimonial evidence, and the state agency medical consultants' opinions and determined that she has the RFC to perform light work except that she cannot climb ladders, ropes or scaffolds, and can only occasionally climb stairs or ramps, balance, crouch, crawl, stoop or kneel. (R. 19). With respect to Plaintiff's musculoskeletal complaints, the ALJ discussed all of the medical treatment records and found that they "fail to show any consistent, ongoing neck or hand pathology which would limit her work abilities beyond the lifting limitation included in this decision." (R. 22).

The ALJ discussed Plaintiff's Crohn's disease at length. She found that the treatment notes from Dr. Aziz's office and the record "in general similarly show intermittent periods when the claimant felt her symptoms were serious enough to seek attention, but fail to show ongoing, persistent and serious complaints or clinical abnormalities." (*Id.*). The ALJ also noted that Plaintiff had been able to work for many years while having Crohn's disease, and even when her "condition was demonstrably more serious, such as in 2005 when she underwent a colon resection." (*Id.*). Yet unlike at that time, the ALJ wrote that since the date of alleged onset Plaintiff had not been hospitalized or gone to the emergency room for Crohn's disease symptoms. Instead,

the ALJ found that Plaintiff's condition appeared to be "under fairly good control" aside from "her reports of using the bathroom frequently." (*Id.*).

Further, while Plaintiff reported diarrhea and the need to go to the restroom six to nine times a day on multiple occasions, the ALJ observed that "actual documented instance[s] of flare-ups of her symptoms" were "not at all well documented." (*Id.*). In that regard, the ALJ observed that Plaintiff had reported symptoms from Crohn's disease to her physician in October 2010, June 2011, and June 2012 but "otherwise did not appear to even warrant medical attention other than taking her medications" and suffered from none of the "serious complications of Crohn's disease described in the listing section." (*Id.*). The ALJ also noted that Plaintiff's "use of medications has been generally consistent with the presence of relatively mild symptoms of an intermittent nature." (R. 23). Finally, the ALJ stressed a "lack of opinions from treating physicians that the claimant is disabled or has limitations greater than those found in this decision." (R. 24).

Based on the stated RFC and the VE's testimony, the ALJ found that Plaintiff is capable of performing her past relevant work as a shipping checker. (R. 24, 56). The ALJ thus concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any date from the April 1, 2010 alleged onset date through the March 31, 2012 date last insured. (R. 24).

<u>**DISCUSSION**</u>

**A.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act. In reviewing this decision, the court may not engage

in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court will "'reverse an ALJ's determination only where it is not supported by substantial evidence, which means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B. Five-Step Inquiry

To recover disability benefits, a claimant must establish that she is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A person is disabled if she is unable to perform "any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing whether: "(1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-352 (7th Cir. 2005) (citing 20 C.F.R. § 404.1520). "The claimant bears the burden of proof in each of the first four steps." *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## C.     Analysis

Plaintiff advances four independent reasons that the ALJ's decision must be reversed or remanded. The Court addresses each in turn.

### 1.     Mental Impairments

**a.     Failure to Assess**: Plaintiff first objects to the ALJ's determination that her mental impairments are not severe, arguing that the ALJ failed to assess her abilities in four broad functional areas in accordance with 20 C.F.R. Part 404 Subpart P,

App. 1 (known as the "paragraph B criteria").  (Doc. 13, at 5).  The categories include: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.  *See Lembke v. Barnhart*, No. 06 C 0306, 2006 WL 3834104, at *4 n.2 (W.D. Wis. Dec. 29, 2006) (citing 20 C.F.R. Part 404, Subpart P, App. 1, 12.00 (the listings for mental disorders)).  Plaintiff claims that the ALJ essentially ignored these criteria, stating only in perfunctory fashion that she was relying on mild findings from consultative examiners Dr. Low and the ME without discussing any of their underlying reasoning.  (Doc. 13, at 6).

The Court agrees with Plaintiff that the ALJ's discussion of the paragraph B criteria is rather minimal at Step 3 of her analysis.  (R. 17, 18).  Throughout the rest of the decision, however, the ALJ provides a detailed recitation of Plaintiff's abilities in each area of functioning, and adequately explains her conclusion that Plaintiff does not have a severe mental impairment.  (R. 18, 23).  With respect to concentration, persistence or pace, for example, the ALJ noted that Plaintiff filed Function Reports on September 8, 2011 and March 20, 2012 indicating that paying attention is "not a problem" for her, and that she can follow both written and spoken instructions.  (R. 23, 155, 183).  Those reports also reflect that she finishes what she starts.  (R. 155, 183).

In the area of social functioning, Plaintiff recounted in her Function Reports that she watches her daughter at sporting events, visits with friends and family, visits her husband at work a few times a week,  socializes on the computer, and has "no problem" getting along with authority figures.  (R. 23, 154, 156, 182, 184).  Plaintiff also has minimal difficulties with her activities of daily living, agreeing that she is able to attend to her personal care needs without reminders, go out alone, drive a car, shop, do laundry

with assistance, and prepare simple meals. (R. 23, 151-53, 179-81). As the ALJ observed, these answers are all generally consistent with what Plaintiff told Dr. Sterzik during her psychological evaluation on October 22, 2011. (R. 23, 294-95). This Court will not discount the ALJ's discussion of the paragraph B criteria "simply because it appears elsewhere in [her] decision," and Plaintiff's request for remand on this basis is denied. *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (discussion in RFC determination was sufficient to support earlier Step 3 analysis because "[t]o require the ALJ to repeat such a discussion throughout his decision would be redundant").

      **b.**    **Weight Given to Opinions**: Plaintiff next asserts that the ALJ erred in giving the opinions from Dr. Low and the ME greater weight than opinions from PA Gillick and PA Baum. (Doc. 13, at 6). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(5); *see Simila*, 573 F.3d at 514.

As a preliminary matter, it is not at all clear that the treatment notes from PA Gillick and PA Baum qualify as psychological "opinions" under the regulations. Though PA Gillick diagnosed Plaintiff with depression and ADD, she is not an expert in psychiatry or psychology; there is no evidence that she conducted any supporting psychological testing; and she provided no assessment as to the severity of any related symptoms or how they limit Plaintiff's ability to perform basic work activities, if at all. *See* 20 C.F.R. § 404.1527(a)(2) ("medical opinions" are "statements from [medical sources] that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). Indeed, Plaintiff herself concedes that while her medical records contain specific facts "[w]hat [is] missing [is] the ultimate professional opinions arising from those facts…." (Doc. 21, at 4).

Plaintiff suggests that the ALJ should have re-contacted PA Gillick or someone else from Dr. Aziz's office to ask for such an opinion. (Doc. 21, at 4). "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, the ALJ had an RFC from Dr. Low stating that Plaintiff has no severe mental impairment, and the ME agreed with that assessment. In addition, Plaintiff was represented by counsel throughout these proceedings but never submitted contrary medical records from Dr. Aziz's office suggesting she has a disabling mental impairment. *Thorps v. Astrue*, 873 F. Supp. 2d 995, 1007 (N.D. Ill. 2012) (quoting *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987))

(an ALJ is "'entitled to assume' that an applicant represented by an attorney is making [her] 'strongest case for benefits.'").

As for the existing medical records, the ALJ clearly reviewed and considered all of the treatment notes from Dr. Aziz's office and explained why they do not support a finding that Plaintiff has a severe mental impairment. (R. 17) ("actual reports of depressive symptoms or difficulty with attention are relatively rare."). PA Gillick diagnosed Plaintiff with ADD on June 9, 2011 and prescribed Vyvanse. (R. 369-70). At her next appointment more than seven months later on January 24, 2012, Plaintiff complained for the first time about frequent crying, increased irritability, feelings of guilt, decreased energy and concentration, and weight gain. (R. 18, 375). One week later, on January 31, 2012, however, Plaintiff's depression and anxiety were both "well controlled" with Vyvanse and Cymbalta. (R. 386).

Plaintiff did not mention any problems with anxiety or depression during appointments on July 5 or August 9, 2012, then had a depressive episode on December 4, 2012 where she was very irritable, frustrated, unhappy and angry with a blunted and abnormal affect. (R. 18, 412, 415). The ALJ correctly observed based on the treatment records that Plaintiff was having financial difficulties at the time. (R. 18, 412). PA Gillick prescribed Wellbutrin and Lexapro, and Plaintiff's mood and affect had returned to normal by December 20, 2012. (R. 18, 417). At her last appointment with PA Gillick on February 5, 2013, Plaintiff did not complain of any symptoms of anxiety or depression at all. (R. 18, 422). On the record presented, the ALJ reasonably accepted the uncontroverted opinions from Dr. Low and the ME that Plaintiff's anxiety and depression are not severe impairments. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004)

("The ALJ may properly rely upon the opinion of [state agency] medical experts" to determine whether a claimant's impairment meets or equals a listing).

       **c.**      **Treatment for Depression:** Plaintiff next argues that the ALJ committed reversible error by stating that she only sought care for depression from her primary care physician when, in fact, she participated in family therapy for a year.  It is true that the ALJ stated Plaintiff "did not seek any psychological treatment beyond her primary care physician," but she also affirmatively acknowledged and discussed Plaintiff's therapy sessions in detail later in the decision.  (R. 18, 20).  As a result, there is no merit to Plaintiff's assertion that the ALJ conducted a "superficial review of the record" or somehow played doctor in assessing her mental capacity.  (Doc. 13, at 8).  Notably, Plaintiff did not state that the family therapy, which aimed to "try and get [her family] to understand . . . how to pitch in," constituted treatment for her depression or ADD.  (R. 20, 46-47).  Moreover, Plaintiff admits that there are no treatment notes relating to that family therapy anywhere in the record.  Plaintiff blames the ALJ for failing to obtain them as part of her duty to develop a full and fair record, but this argument is unavailing.  (Doc. 13, at 7).

In Social Security disability cases, "the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."  *Scheck*, 357 F.3d at 702 (citing 20 C.F.R. § 404.1512(c)).  "The ALJ's duty to develop the record is not so sweeping that it can relieve an applicant entirely of h[er] own responsibility for supporting h[er] claim; instead, the ALJ must exercise some discretion in deciding when and how [s]he should order additional evidence."  *Griffin v. Barnhart*, 198 F. App'x 561, 564 (7th Cir. 2006).  And as noted, when a claimant is represented by counsel, the ALJ

is "'entitled to assume' that an applicant . . . is making [her] 'strongest case for benefits.'" *Thorps*, 873 F. Supp. 2d at 1007 (quoting *Glenn*, 814 F.2d at 391).

Here, Plaintiff was represented by counsel at every step of the proceedings before the ALJ and this Court, but she never provided copies of the family therapy notes. In such circumstances, her insistence that those records would "shed more light" on and be "highly relevant" to determining the scope of her mental limitations rings hollow. *See Martin v. Astrue*, 345 F. App'x 197, 202 (7th Cir. 2009) (no remand necessary where the plaintiff "did not identify or provide additional records before the Appeals Council or the district court, and even now he has not attempted to detail what additional information about his condition the ALJ would have uncovered.").

   **d. ADD Diagnosis:** Plaintiff next argues that the ALJ improperly dismissed Dr. Sterzik's diagnosis of "[Rule-Out] Attention Deficit Hyperactivity Disorder, inattentive type" on the grounds that it was "based on subjective complaints rather than any objective evidence of that disorder." (R. 17; Doc. 13, at 7). Plaintiff says this was error because the ALJ simultaneously accepted subjective complaints suggesting her mood was "generally fine." (Doc. 13, at 7) ("Apparently, subjective *complaints* are unreliable, and subjective 'non-complaints' are not") (emphasis in original). This is not accurate.

The ALJ discussed Dr. Sterzik's objective findings in detail, including: Plaintiff's mood during the evaluation was "generally fine"; her affect was "euthymic"; aside from occasional problems getting out of bed, she denied any "other symptoms of depression" for the majority of the time; her basic attention skills appeared to be intact; and, her memory appeared adequate during the examination. (R. 17). As the ALJ noted,

Plaintiff's mental assessment was "essentially entirely normal," and Dr. Sterzik diagnosed only "rule out" ADD, meaning that the impairment "*needs to be ruled out.*" *Schimpf v. Astrue*, 780 F. Supp. 2d 798, 801 (S.D. Ind. 2011) (emphasis in original). Since there are no records that Plaintiff underwent psychological testing or evaluation (much less by a licensed psychiatric specialist) to support an ADD diagnosis, the ALJ reasonably determined that Dr. Sterzik made that assessment based only on what Plaintiff told him. *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993) (ALJ correctly rejected physician's opinion where diagnoses appeared to be conclusory statements attempting to explain claimant's subjective complaints). *See also Davis v. Barnhart*, 187 F. Supp. 2d 1050, 1057 (N.D. Ill. 2002) (ALJ did not "play doctor," rather "properly discounted" medical "diagnosis based on subjective complaints.").

Viewing the record as a whole, the Court finds that the ALJ built a logical bridge between the evidence and her conclusion that Plaintiff does not suffer from a severe mental impairment, and the request for remand on this basis is denied.

### 2.    Physical Impairments

Plaintiff next asserts that her "long time treating doctor documents symptoms and limitations from the chronic Crohn's disease that makes any sustained work activity impossible." (Doc. 13, at 8). She argues that the ALJ ignored this evidence and engaged in her own "lay personal analysis" of her Crohn's disease, degenerative joint disease of the cervical spine, and cervical spine radiculopathy. (*Id.*). As a preliminary matter, Plaintiff inexplicably provided *no* treatment records at all from the gastroenterologist, Dr. Atia, who she identified as the primary doctor treating her for Crohn's disease at the time of the hearing and over the preceding four years. Hence

there can be no basis for the assertion that Dr. Atia documented symptoms and limitations from the Crohn's disease that the ALJ ignored. Moreover, Plaintiff testified that she was seeing Dr. Atia every couple of months and he was about to prescribe a new medication because "he doesn't feel the Lialda is effective." (R. 41).[12]

Rather than providing the ALJ with treatment records and an opinion from this specialist who had been treating her Crohn's disease for four years, Plaintiff opted to rely on treatment records for periodic visits to her primary physician's office where she was treated by physician assistants (usually PA Gillick) between February 2010 and February 2013. As the ALJ noted, however, these visits were not frequent and were intended to address a variety of complaints rather than focused solely on her Crohn's disease. Based on her review of these records, the ALJ concluded that there were only intermittent periods when Plaintiff felt her symptoms were serious enough to seek attention, and she did not suffer from ongoing, persistent and serious complaints or clinical abnormalities. Indeed, while Plaintiff urges that the records reflect symptoms and limitations that prevented her from working, the records from Dr. Aziz's office always reflected that Plaintiff had "No physical disability and activities of daily living were normal." (R. 332, 336, 340, 344, 348, 355, 361, 365, 368, 376, 387, 408, 414, 419, 424). Nonetheless, Plaintiff faults the ALJ for not seeking opinions from her treating physicians regarding her limitations and the extent of her disability, never explaining why she (directly or through counsel) did not request such opinions (or even

---

[12] Plaintiff provided a record for a single visit to Dr. Mary Kane on February 27, 2013 regarding the long-delayed colonoscopy that Dr. Kane performed. While Plaintiff's states in her brief that she consulted Dr. Kane "when treatments were not working" (Doc. 13, at 9), no record citation is provided and Dr. Kane's record does not reflect this.

the treatment records of Dr. Atia) if they would have strengthened her claim for benefits. (Doc. 13, at 9).

Addressing Plaintiff's musculoskeletal complaints, the ALJ aptly observed that based on the treatment notes in the record, they clustered around February through March 2010, and then not again until March 2011, after Plaintiff fell. (R. 21). The ALJ also discussed Plaintiff's October 15, 2011 internal medicine consultative examination with Dr. Shah, noting that she said she could not carry things because of her neck pain and symptoms. Upon physical examination, however, Dr. Shah found only mild tenderness in her neck, some limitation of motion and "slight" numbness in her right index finger, and mild tenderness in her hands and knees. (*Id.*). Plaintiff exhibited no limitation of motion or swelling in her knees, a normal gait, and an ability to perform heel and toe walking. (*Id.*). As the ALJ noted, "[t]he consultative examiner described the examination as fairly unremarkable, listing only obesity, mild anxiety, and depression." (*Id.*).

Finally, the ALJ relied on the opinion of Dr. Bilinsky who had reviewed all of the medical records through the date of his opinion, including the consultative physical examination and findings, and concluded that Plaintiff is able to perform medium work notwithstanding her Crohn's disease and knee, neck and hand pain. (R. 20-22, 314-17). The ALJ gave Dr. Bilinsky's opinion some weight but also imposed additional lifting and postural restrictions to account for Plaintiff's obesity and musculoskeletal impairments as set forth in the treatment records and Dr. Shah's report. (R. 23-24).

The resulting RFC is more restrictive than any of the limitations imposed by the physicians of record. Plaintiff does not cite to any contrary opinions.[13]

### 3.    RFC Determination

Plaintiff argues that the case must also be remanded because the ALJ's RFC determination is flawed. A claimant's RFC is the maximum work she can perform despite her limitations, and is a legal decision rather than a medical one. *Moore v. Colvin*, No. 15 C 2398, 2016 WL 3568808, at *4 (N.D. Ill. July 1, 2016) (citing 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *2. Plaintiff claims that the ALJ did not consider her impairments "in concert" when making the RFC determination, and improperly rejected her statements regarding the intensity, persistence and limiting effects of her symptoms.

### a.    Failure to Consider all Impairments

Plaintiff "correctly observes that an ALJ is required to consider the aggregate effects of a claimant's impairments, including impairments that, in isolation, are not severe." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (citing 20 C.F.R. § 404.1523). Plaintiff insists this did not occur here because the ALJ "considered each of Plaintiff's medical problems for the purpose of canceling out the others." (Doc. 13, at

---

[13]    The Court disagrees with Plaintiff's assertion that the ALJ abused her discretion by not purchasing a consultative examination. An ALJ "is not required to order such examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient." *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). *See also* 20 C.F.R. § 404.1519a(b) (the SSA may purchase a consultative exam "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim."). Given the content of the medical records, Dr. Bilinsky's uncontroverted opinion and the "lack of opinions from treating physicians that the claimant is disabled or has limitations greater than those found in this decision," there was no need for the ALJ to order a consultative physical examination. (R. 24). *See also Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (a reviewing court will generally defer to "the reasoned judgment of the Commissioner on how much evidence to gather," particularly on behalf of claimants who have representation).

10) (citing *Engstrand v. Colvin*, 788 F.3d 655 (7th Cir. 2015)).  As Plaintiff explains, the ALJ used flare-ups of one physical impairment to imply that the others no longer existed, i.e., when Plaintiff visited her doctor because of a musculoskeletal issue, "the ALJ inferred her Crohn's disease was cured."  (Doc. 13, at 10).

The Court disagrees with Plaintiff's characterization of the ALJ's analysis and finds that her RFC is supported by substantial evidence.  The ALJ thoroughly addressed Plaintiff's symptoms and treatment for her Crohn's disease, arthritis, bulging discs in her neck, and obesity, as well as her depression and ADD.  (R. 19-24).  There is no mention of Plaintiff being "cured" of any impairment throughout this discussion.  Rather, the ALJ merely pointed out that there were time periods when Plaintiff did not complain of certain symptoms.  Plaintiff fails to cite to any objective medical evidence or opinions suggesting that she has greater functional limitations than those set forth in the ALJ's RFC.  As noted, the physical RFC is more restrictive than the limitations imposed by any physician of record, and the mental RFC fully accounts for Plaintiff's mild limitations in each area of functioning.

Viewing the record as a whole, the Court is satisfied that the ALJ built a logical bridge between the evidence and her RFC determination.

**b.    "Credibility" Determination**

Plaintiff also objects to the ALJ's determination that her statements regarding the intensity, persistence and limiting effects of her symptoms are "not entirely credible." (Doc. 13, at 11).   The regulations describe a two-step process for evaluating a claimant's own description of her impairments.  First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that

could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2.[14] If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). An ALJ's assessment of a claimant's subjective complaints will be reversed only if "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Contrary to Plaintiff's assertion, the ALJ did not discredit her complaints of severe pain because she lacked "objective medical corroboration." (Doc. 13, at 12) (citing *Engstrand v. Colvin*, 788 F.3d 655 (7th Cir. 2015)). Rather, the ALJ appropriately considered the objective evidence as one factor in assessing Plaintiff's subjective complaints. *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) (an ALJ may compare a claimant's allegations with the objective medical evidence in assessing symptom severity because "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration."). As discussed earlier, the ALJ then

---

[14] The Social Security Administration recently updated its guidance for evaluating symptoms in disability cases. SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016, 2016 WL 1237954). The new ruling supersedes SSR 96-7p and eliminates the term "credibility" to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Since the regulation merely clarifies rather than changes existing law, it is appropriate to evaluate Plaintiff's credibility argument in light of the new guidance. *Lockwood v. Colvin*, No. 15 C 192, 2016 WL 2622325, at *3 n.1 (N.D. Ill. May 9, 2016). *See also Estes v. Colvin*, No. 14 C 3377, 2016 WL 1446218, at *6 (N.D. Ill. Apr. 11, 2016).

reasonably concluded from that evidence that it does not support greater limitations than those set forth in the RFC.

Plaintiff also argues that the ALJ should not have discounted her testimony based on her ability to perform activities of daily living. (Doc. 13, at 12). It is well-established, however, that "an ALJ must consider the claimant's daily activities" in assessing her statements regarding her symptoms. *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012). *See also Hackel v. Colvin*, No. 14 C 1429, 2016 WL 707020, at *15 (E.D. Wis. Feb. 22, 2016) ("[I]t is proper for the ALJ to consider a claimant's activities of daily living in assessing [the limiting effects of her symptoms] because inconsistencies between activities of daily living and the claimant's self-reported limitations may suggest that a claimant's testimony regarding her symptoms are exaggerated.").

The ALJ fairly summarized Plaintiff's own statements that despite having some difficulties handling stress, she has no problem attending to her personal care needs or concentrating, and can regularly shop, prepare meals, go out alone, drive, go on vacation, and go out with friends. (R. 23). The ALJ reasonably concluded that these activities are not consistent with Plaintiff's claims of disabling pain or limitations. (*Id.*). Contrary to Plaintiff's assertion, moreover, the ALJ in no way equated these activities with an ability to work full-time. *Cf. Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize these differences [between activities of daily living and activities in a full-time job] is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."). Instead, this was just one factor the ALJ considered in assessing Plaintiff's subjective statements concerning the

intensity, persistence and limiting effects of her symptoms. There was nothing improper about this aspect of the ALJ's analysis.

Plaintiff claims the ALJ still erred by citing to her essentially "routine and conservative" treatment and lack of hospitalizations or emergency room visits. (Doc. 21, at 9; R. 23). Plaintiff stresses that Crohn's disease is "notorious for flare-ups, and one would expect some days to be better than others." (*Id.*). The difference, as the ALJ noted, was that Plaintiff's flare-ups in the past had been more severe, requiring hospitalization. Not only was she hospitalized twice in 2005, but she also reported in 2005 that she had been admitted for flare-ups for Crohn's disease four times in the four preceding years. (R. 222). Plaintiff testified at the hearing that her symptoms (and frequent bowel movements) had begun to get worse before the 2005 surgery and the worsening continued over the years that followed. But the record contained no evidence of *any* treatment for flare-ups (much less a hospitalization) between 2006 and June 9, 2011 when she went to her primary care physician's office and was treated by PA Gillick for a Crohn's exacerbation (and evaluation for ADD). Indeed, during the hearing before the ALJ, Plaintiff's counsel highlighted this particular doctor's visit in June 2011 as the basis for a potential alternative onset date (in lieu of April 1, 2010), noting that the condition appeared to get worse at this time, leading Plaintiff to seek treatment in June 2011 and to apply for disability benefits two months later. (R. 59-60).

In response to the flare-up on June 9, 2011, PA Gillick prescribed Apriso medication with sufficient refills to last until June 9, 2012. (R. 370). Plaintiff did not return for treatment again for another seven months. At that next visit, on January 24, 2012 (two weeks after her disability appeal was denied), Plaintiff described a long list of

physical and mental problems. She additionally stated that she was still going to the bathroom 6 to 9 times a day. (R. 375) She next complained about the frequency of her bowel movements on July 5, 2012 when Plaintiff saw PA Gillick for a "medicine check" and reported "having problems with her Crohns again - diarrhea at least 6 times a day". (R. 394). PA Gillick had her resume Apriso (as noted, the prior prescription would have lasted only through June 9, 2012, and Apriso was not listed under "Current Medications"). (R. 394-398). After this, Plaintiff made no mention of frequent bowel movements when she saw PA Gillick on August 9, 2012,[15] December 14, 2012, December 20, 2012 or February 5, 2013, and there is no record of any visits after this and prior to the hearing before the ALJ in September 2013. (R. 407, 412, 417, 422).

On this record, the ALJ did not err in finding that the actual documented instances of flare-ups of Plaintiff's symptoms from Crohn's were "not at all well documented" and the few that were (which ALJ expressly discussed) reflected relatively mild symptoms treated with medication. (R. 22). This Court finds the ALJ thus built a logical bridge between the evidence of record and her conclusion that Plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms did not support her claim of disability.

### 4. Vocational Expert's Testimony

Plaintiff finally argues that the ALJ "ignored the [VE]'s testimony regarding job availability for an individual who needs constant access to a bathroom throughout an eight hour day, improperly determining the Plaintiff is capable of performing past work." (Doc. 13, at 13). The problem with this argument is that the ALJ did not find that

---

[15] The purpose of the August 9th visit was to discuss changing the Apriso prescription due to the cost, and to this end, PA Gillick instead prescribed Pentasa with Feldene. (R. 407, 411).

Plaintiff's RFC required any specific limitation concerning using the bathroom. This was not error. No treating or consultative physician opined that Plaintiff would be unable to work due to a need for frequent bathroom breaks, or even that she required close proximity to a bathroom during the work day. Nor did the treatment records and other evidence require the ALJ to conclude that such limitations were necessary.

While Plaintiff testified that the problem with frequent bowel movements had begun in 2005, the ALJ noted that Plaintiff had held a job at that time despite more severe symptoms. In addition, the first medical record noting a problem with excessive bowel movements was on June 9, 2011, two months before Plaintiff applied for disability. Notably, Plaintiff informed PA Gillick that she "normally" had only 3 bowel movements a day, rather than 6 to 9 a day as she reported during that visit. (R. 367). As the ALJ noted, the doctor visits where symptoms from Crohn's disease were reported were infrequent and did not appear to warrant medical attention other than medication. In terms of the problem of frequent bowel movements, after the June 9, 2011 visit to PA Gillick, Plaintiff next raised this issue during a visit to PA Gillick on January 24, 2012, and finally on July 5, 2012. After getting her Apriso refilled on July 5, 2012, the records do not reflect that Plaintiff reported the problem during any subsequent visits.

On this record, the ALJ was not required to find that Plaintiff required limitations relating to her bathroom use and to include these in the RFC. The VE testified that the "general rule" is employees who are not in an "accommodated position" are allowed a five minute break for restroom use every two hours. (R. 57). Putting aside bathroom visits during the lunch hour and before and after work, this allows an employee four

bathroom breaks during working hours. The VE also testified that there usually is a nearby bathroom in any type of office setting, though he would need to examine every single facility to verify this. (*Id.*). Applying the limitations ultimately imposed by the ALJ, the VE opined that Plaintiff would be able to perform her past relevant work as a shipping checker. (R. 24, 56). Given this testimony and the other evidence presented, the ALJ did not err in concluding at step 4 that Plaintiff is capable of performing her past work.

## CONCLUSION

For the reasons stated, Plaintiff's Motion for Summary Judgment [Doc. 12] is denied and the ALJ's decision is affirmed. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: September 29, 2016

_____
SHEILA FINNEGAN
United States Magistrate Judge